IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

IRYNA GEMMRIG,                                    Civ. No. 1:22-cv-01814-AA

           Plaintiff,                             **ORDER**

     v.

ASANTE THREE RIVERS MEDICAL
CENTER, LLC; ASANTE, dba ASANTE
HEALTH SYSTEM,

           Defendants.

_____

STACIE FOLIN,                                     Civ. No. 1:23-cv-01389-AA

           Plaintiff,

     v.

ASANTE THREE RIVERS MEDICAL
CENTER, LLC; ASANTE, dba ASANTE
HEALTH SYSTEM,

           Defendants.

_____

AIKEN, District Judge:

       This case comes before the Court on a Findings and Recommendation ("F&R")

filed by Magistrate Judge Mark D. Clarke, ECF No. 53.  These two cases were

consolidated with others "for the limited purpose of allowing the parties to brief

motions for summary judgment on the issues of undue hardship and reasonable

accommodation."  F&R at 1.   Judge Clarke recommends that the Court GRANT

Page 1 – ORDER

Defendants' Motion for Summary Judgment, ECF No. 33, and DISMISS the cases with prejudice.  For the reasons explained below, the Court ADOPTS Judge Clarke's F&R, ECF No. 53, in full.

## LEGAL STANDARDS

Under the Federal Magistrates Act, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).  If a party files objections to a magistrate judge's findings and recommendations, "the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  *Id.*; Fed. R. Civ. P. 72(b)(3).

For those portions of a magistrate judge's findings and recommendations to which neither party has objected, the Act does not prescribe any standard of review. *See Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting [the Act], intended to require a district judge to review a magistrate's report to which no objections are filed.").  Although no review is required in the absence of objections, the Magistrates Act "does not preclude further review by the district judge[] *sua sponte* . . . under a *de novo* or any other standard."  *Id.* at 150.  The Advisory Committee Notes to Fed. R. Civ. P. 72(b) recommend that "[w]hen no timely objection is filed," the court should review the recommendation for "clear error on the face of the record."

**DISCUSSION**

Plaintiffs Gemmrig and Folin ("Plaintiffs") are two of numerous plaintiffs in this consolidated summary judgment motion. Plaintiff Folin brings a religious discrimination failure-to-accommodate claim against Defendants under Title VII, 42 U.S.C. 2000e *et seq.*, and ORS 659A.030. Plaintiff Gemmrig brings a disability discrimination failure-to-accommodate claim against Defendants under the ADA, 42 U.S.C. § 12101 *et seq.*, and ORS 659A.112. Judge Clarke recommends that the Court grant summary judgment for Defendants on both claims and on Defendants' evidentiary objections. Plaintiffs timely filed objections, ECF No. 55, and Defendants responded, ECF No. 56.

I.    *Evidentiary Objections*

    A.    *Exclusion of the French Report*

Defendants move to exclude the French Report as unreliable because "[it is] not based on sufficient facts or data and [is] not the product of reliable principles and methods." Def. Reply at 12, ECF No. 46. Plaintiffs object that Judge Clarke reads Federal Rule of Evidence 702 and *Daubert's* gate-keeping requirement too strictly. Pl. Obj. at 7. Plaintiffs argue that the court improperly accepted Defense counsel's portrayal of Dr. French as a "purveyor of junk science," *id.* at 9, when, instead, Dr. French is a scientist who holds "a minority opinion[,]" *id.* at 10, and "simply . . . challenges the scientific orthodoxy[,]" *id.* at 9. The Court disagrees.

First, as Judge Clarke explained, Plaintiffs failed to respond in a sur-reply to Defendants' motion to strike the French Report. F&R at 12. A district court need not

"consider new arguments raised for the first time in an objection to a magistrate judge's findings and recommendation." *Brown v. Roe*, 279 F.3d 742, 745-46 (9th Cir. 2002). Even so, Judge Clarke considered the merits of the motion. Second, as, Judge Clarke explained, under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), "the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." F&R at 10–11 (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). "A district court cannot be silent about reliability when challenged." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022). "To carry out its gatekeeping role, a district court must find that an expert's testimony is reliable—an inquiry that focuses not on 'what the experts say,' or their qualifications, 'but what basis they have for saying it.'" *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1411, 1316 (9th Cir. 1995)). "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive[.]" *Daubert*, 43 F.3d at 1315–16.

In his Report, Dr. French opines that "[t]he medical literature does not support the assertion that the COVID-19 vaccines were effective in preventing infection[,]" French Report ¶ 12, ECF No. 44, and that "the COVID-19 vaccinations do in fact have adverse complications and do not have a favorable risk/benefit analysis[,]" *id.* ¶ 20. To support his opinion, Dr. French provides six studies, five of which were published

after the relevant time period and are thus irrelevant here.[1]  *See* French Report, Exs. 2–5, missing Ex. 7, Ex. 8.  From these studies, Dr. French misleadingly cites data without context,[2] misinterprets findings that do not in fact support his opinion,[3] and cherry-picks data and random findings to bolster his opinion.[4]  Defendants' expert,

---

[1] "[I]t is appropriate to confine the analysis to the information available to the employer when it made its undue hardship decision."  *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1152 (D. Or. 2024).

[2] *E.g.*, "'Out of . . . 469 cases [in a July 2021 Massachusetts COVID-19 outbreak] . . . 74% . . . of them occurred in fully vaccinated persons.'"  French Report ¶ 12 (quoting Brown, Catherine M., *Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings—Barnstable County, Massachusetts, July 2021*, 70 MMWR (2021)).  Ex. 2, ECF No. 44 at 20.  Defendants' expert, Dr. Cohen, contends that "[b]ecause vaccination was common [in that particular town], it is unsurprising that fully vaccinated people comprised the majority of COVID cases.  This is a well described phenomenon in epidemiology."  Cohen Report ¶ 11.  Dr. French asserts that this study shows that "[t]he medical literature does not support the assertion that the COVID-19 vaccines were effective in preventing infection."  French Report ¶ 12.  But Dr. Cohen points out that Dr. French fails to note that "[t]he article concludes 'Vaccination is the most important strategy to prevent severe illness and death[.]'"  Cohen Report ¶ 11 (quoting Brown, Catherine M.).

[3] *E.g.*, "'Vaccination reduces the risk of the delta variant infection and accelerates viral clearance.  Nonetheless, fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection[.]'"  French Report ¶ 13 (quoting Singanayagam, Anika et al., *Community Transmission and Viral Load Kinetics of the SARS-CoV-2 Delta (B.1.617.2) Variant in Vaccinated and Unvaccinated Individuals in the UK: A Prospective, Longitudinal, Cohort Study*, 22 Lancet Infectious Diseases 183 (Feb. 2022)).  Ex. 3, ECF 44 at 28.  Dr. Cohen contends that "Dr. French misinterprets these results, which strongly support vaccination among healthcare workers.  He simply lifts a concluding sentence to support his opinion, which does not reflect an accurate interpretation of this study."  Cohen Report ¶ 14.

[4] *E.g.*, "'Because these viruses [coronaviruses] generally do not elicit complete and durable protective immunity by themselves, they have not to date been effectively controlled by licensed or experimental vaccines.'"  French Report ¶ 14 (quoting Morens, David M. et al., *Rethinking Next-Generation Vaccines for Coronaviruses, Influenza viruses, and Other Respiratory Viruses*, 31 *Cell Host & Microbe* 146 (Jan. 11, 2023)).  Ex. 4, ECF 44 at 41.  But Dr. French omitted passages such as: "During the COVID-19 pandemic, the rapid development and deployment of

Dr. Cohen, attests that Dr. French's "articles and reports [are] of varying quality and scientific merit," Cohen Report ¶ 9, ECF No. 47-1, and that even the reputable sources, such as the reports of Exhibits 3 and 4, "are either incorrectly interpreted or selectively misquoted" and that Exhibit 2's report "does not illustrate what Dr. French purports it to show." *Id.* ¶ 10. To determine whether an expert opinion is reliable, a court must determine whether that opinion is supported by "sufficient facts or data," is based on "reliable" methodology, and is "reliably applied to the facts of the case." *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1269 (9th Cir. 2024) (quoting Fed. R. Evid. 702). Inaccurately characterized facts and data are neither "sufficient facts and data" nor do they reflect reliable methodology.

Remarkably, Dr. French also cites to the Rancourt Study[5] and its "alarming" results for the proposition that the COVID-19 vaccine increases all-cause mortality and is thus ineffective and unsafe. French Report ¶ 17, Ex. 6, ECF 44 at 61. The Rancourt Study, which collected mortality data after the introduction of the vaccine

---

SARS-CoV-2 vaccines has saved innumerable lives and helped to achieve early partial pandemic control. However, as variant SARS-CoV-2 strains have emerged, deficiencies in these vaccines reminiscent of influenza vaccines have become apparent." Dr. Cohen, noting that the senior author is Dr. Anthony Fauci, contends that "[i]t is well known that the current protection afforded by COVID-19 vaccines and those of other respiratory viruses is not life-long." Cohen Report ¶ 15. "The fact that the 'next generation of vaccines' has not yet arrived or that the vaccines do not afford 100% protection is not a viable argument against highly effective contemporary vaccines." *Id.*

[5] Rancourt, D.G. et al., *COVID-19 vaccine-associated mortality in the Southern Hemisphere*, CORRELATION Research in the Public Interest, (Sep. 17, 2023), https://correlation-canada.org/covid-19-vaccine-associated-mortality-in-the-Southern-Hemisphere/. French Report ¶ 19, Ex. 6, ECF No. 44 at 61.

in 17 countries in the southern hemisphere, has been uniformly criticized by courts across this District for failing to compare the post-vaccine mortality rate to the already elevated (pandemic-related) pre-vaccine mortality rate and for Dr. French's faulty interpretation that the vaccine caused the excess mortality. *See, e.g.*, *Sano v. PeaceHealth*, No. 6:22-cv-01210-MTK, 2024 WL 4979429, at *4 (D. Or. Dec. 4, 2024) ("The study's methodology is grossly flawed.  It relies on a finding that, 'no excess mortality occur[red] in the pre-vaccination period.'") (citing Rancourt Study at 16); *Parker v. PeaceHealth*, No. 6:23-cv-00450-MTK, 2024 WL 4993472, at *3 ("Dr. French's explanation of the Rancourt Study's scientific legitimacy is cursory and grossly deficient. . . . Having conducted 'a preliminary assessment of whether the reasoning or methodology underlying [the French Report] is scientifically valid,' the Court finds that the Rancourt Study is junk science.") (quoting *Daubert*, 509 U.S. at 592–93).  Dr. Cohen attested that "[the Rancourt Study] "is a non-peer reviewed piece from a Canadian corporation" that "has been thoroughly criticized and debunked by the scientific community."  Cohen Report ¶ 19 and n.21 (citing the Denis Rancourt blog).[6]

Finally, Judge Clarke noted that other courts in this District have also determined that Dr. French's reports—similar reports that rely on and inaccurately characterize the same sources and their data, findings, and conclusions—are unreliable. *Id.* at 12–13.  *See, e.g.*, *Parker*, 2024 WL 4993472, at *4–5 ("Dr. French's

---

[6] "There Was No Pandemic," https://denisrancourt.substack.com/p/there-was-no-pandemic (last visited Aug. 24, 2025).

expert opinion is . . . unreliable because he misconstrues the exhibits cited in his report[;]" "[T]he mismatch between Dr. French's opinion and the findings and recommendations of the evidence he relies on, calls into question his capacity to comprehend scientific literature[;]" "Dr. French's interpretation of [his reports] are at best incompetent, and at worst, dishonest.").

Here, Judge Clarke properly determined that because the French Report relies on inaccurately characterized data, scientifically debunked sources, and irrelevant sources, that the French Report is unreliable and thus "fails to satisfy the admissibility standards of Rule 702 and *Daubert*." F&R at 14. The Court adopts Judge Clarke's recommendation to exclude the French Report.

    B.    *Exclusion of Plaintiffs' Declarations*

Defendants move to exclude the declarations of fifteen plaintiffs in suits against Defendants (including Gemmrig and Folin) that were attached to Plaintiffs' Response to the summary judgment motion. Def. Reply at 16. *See* C. Janzen Decl., ECF No. 42, Folin Decl. (Ex. 8, ECF No. 42 at 32–35) and Gemmrig Decl. (Ex. 12, ECF No. 42 at 53–56). Gemmrig and Folin's declarations are nearly identical. They attest that:

> Asante did not engage in any individualized discussion with me regarding making any accommodations for my [religious/medical] exception to taking the COVID-19 vaccine. Asante did not discuss with them (sic) any alternative accommodations to keep working for the company other than unpaid leave. They simply granted my religious (sic) exception and put me on unpaid administrative leave indefinitely.

Gemmrig Decl. ¶2; Folin Decl. ¶ 2, and:

> After I left, I discovered that Asante hired unvaccinated travel nurses
> to work there in the Asante facilities while I was on unpaid leave.

Gemmrig Decl. ¶ 3; Folin Decl. ¶ 3.

First, again, Plaintiffs failed to respond in a sur-reply to Defendants' motion to exclude their declarations. F&R at 14–15. Even so, Judge Clarke considered the motion on its merits. He determined that (1) "the declarations fail to support the arguments made by Plaintiffs, and thus are irrelevant to the Court's analysis[,]" F&R at 15, and (2) Plaintiffs' assertion that "Asante hired unvaccinated travel nurses to work there[,]" Folin Decl. ¶ 3; Gemmrig Decl. ¶ 3, lacks "supporting facts evidencing any personal knowledge" that Asante in fact hired unvaccinated travel nurses, F&R at 15.

As to the declarations generally, the Court finds, as did Judge Clarke, that Plaintiffs' Response does not rely on, cite to, or discuss any facts from either Gemmrig's or Folin's (or any Plaintiff's) Declaration. Instead, Plaintiffs' Response cites to "Declarations by Plaintiffs" as the lone support for the assertion that:

> Defendants admit they did not analyze Plaintiffs' cases individually;
> instead, they engaged in a sweeping generalization that no
> unvaccinated individual could be accommodated in the clinical setting
> or otherwise.

Pl. Resp. at 16, ECF No. 41; F&R at 15. But a "bald assertion that evidence sufficient to raise a triable issue exists somewhere in the record is not sufficient to carry a party's burden in responding to a motion for summary judgment." *Anderson v. Multnomah Cnty.*, No. 3:20-cv-00555-YY, 2024 WL 5361178, at *5 (D. Or. Oct. 4, 2024) (citing *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)).

As to Plaintiffs' travel nurse assertions, "[a]n affidavit or declaration used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) ("[D]eclarations not based on personal knowledge are inadmissible and cannot raise a genuine issue of material fact.").

Defendants contend that the declarations cannot be based on personal knowledge because "there is no truth to this claim[.]" Def. Reply at 17; *see also* Payton Decl. ¶ 13, ECF No. 35 ("Effective October 18, 2021, Asante did not allow any workers (including travelers) who were not vaccinated against COVID-19 to continue to work in person.").

Plaintiffs argue that their statements were made with personal knowledge because they made them under oath "and provided specific detail that corroborates their claims." Pl. Obj. at 16. The Court disagrees. Plaintiffs do not provide specific detail about even one travel nurse, or say how they acquired such knowledge; instead, Plaintiffs each provide an identical generic statement.

The Court adopts Judge Clarke's recommendation to exclude Plaintiffs' declarations.

II.    *Motion for Summary Judgment*

Plaintiffs object to Judge Clarke's recommendation to grant summary judgment for Defendants on their Title VII undue hardship affirmative defense and

their ADA undue hardship and direct threat affirmative defenses. Plaintiffs assert that Judge Clarke erred because (1) there are material fact issues as to potential accommodations, Pl. Obj. at 20–22, and (2) Defendants failed to meet the required undue hardship and direct threat showings, Pl. Obj. at 16.

A.     *Material Fact Issues*

Defendants assert that, for patient care providers like Plaintiffs with jobs that could not be performed remotely, "any accommodation other than leave would have been an undue hardship." Def. Mot. at 16. Plaintiffs object that the following material fact issues preclude summary judgment on that defense: (1) whether unvaccinated employees "would have led to a direct threat to safety[,]" Pl. Obj. at 20; (2) whether "*these* [unvaccinated] *Plaintiffs* would have posed a direct threat to the health of the community[,]" *id.* at 20–21 (emphasis in original); (3) whether unvaccinated employees "would have had any effect on their coworkers[,]" *id.* at 21–22; (4) whether vaccination reduces or prevents transmission risks to co-workers, *id.* at 22; and (5) "whether Plaintiffs could have effectively prevented the transmission of COVID-19 [by masking or testing] that would have been just as effective at preventing the spread of COVID-19 as vaccination[,]" *id.* at 22.

The Court disagrees that those facts are in dispute; they are not. "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that

there is some metaphysical doubt as to the material facts." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*

Here, Defendants' experts, Dr. Cohen and Dr. Ghosh, introduced evidence to support that, based on the medical science at that time, "the only safe and reasonable accommodation for . . . employees with approved exceptions who could not work remotely was leave." Ghash Decl. ¶ 32, ECF No. 34.

Plaintiffs provided no evidence to dispute the following material facts, on which Defendants relied to make its accommodation decisions: (1) the severity and magnitude of the COVID-19 pandemic in Oregon, including the surge of morbidity and mortality that occurred during the 2021 appearance of the Delta strain, "the deadliest and most transmissible variant of COVID-19 to date[,]" and the "dire" 2021 COVID-19 forecasts, Ghosh Decl. ¶¶ 12–17 and 23, Ex. 6 (CDC 70 Morb. Mortal. Wkly. Rep. ("MMWR") 1044 (Jul. 30, 2021)); Ex. 3 (OHSU, *COVID Forecast* (Aug. 26, 2021)); (2) the "devastating" impact of the Delta surge on Asante's overflowing hospitals to which the Oregon National Guard was dispatched to help with "everything from janitorial work to administering COVID-19 tests[,]" Ghosh Decl. ¶¶ 13–14; (3) the increased risks of infection and transmission by unvaccinated individuals compared with vaccinated individuals, Ghosh Decl. ¶ 21, Ex. 4 (Stephen J.W. Evans & Nicholas P. Jewell, *Vaccine Effectiveness Studies in the Field*, 385 NEJM 650 (Aug. 2, 2021) and ¶ 22, Ex. 5 (CDC, *Improving communications around vaccine breakthrough and vaccine effectiveness*, (Jul. 29, 2021)); (4) the increased risk

of severe symptoms and death among unvaccinated individuals compared with vaccinated individuals, *id.*; (5) that the vaccine was safe and highly effective at preventing transmission, hospitalization, and death, Ghosh Decl. ¶¶ 25, 21, Ex. 7 (CDC, *Benefits of Getting a COVID-19 Vaccine* (Aug. 16, 2021)); Ex. 8 (CDC, 70 MMWR 1344 (Sep. 24, 2021)); Cohen Report ¶ 13 (citing Stephen M. Kissler et al., *Viral Dynamics of SARS-CoV-2 Variants in Vaccinated and Unvaccinated Persons*, 385 NEJM 2489 (Dec. 23, 2021)); (6) that the CDC recommended that healthcare employers "[c]onsider vaccine mandates for [healthcare providers] to protect [the] vulnerable populations" prevalent in healthcare settings like Asante's, Ghosh Decl. ¶ 22, Ex. 5; (7) that vulnerable people at Asante's facilities included "children and elderly patients and patients with underlying conditions that make them particularly susceptible to COVID-19 . . . and patients [who] could not be vaccinated[,]" *id.* ¶ 20.

Dr. Ghosh also attested that, based on the available medical data, "vaccination was the single most important method" of protection against COVID-19, *id.* ¶ 32; that masking, testing, and distancing were insufficient alone because they "were already the 'baseline' requirements, do not provide continuous protection 24 hours per day, and are susceptible to human error[,]" *id.* at 33; that "[t]o be effective, PPE must be worn constantly and appropriately[]" and that "[i]nside healthcare facilities, transmission can occur in breakrooms where people are less likely to be wearing, or consistently wearing, PPE[,]" *id.*; that, as to testing, "by the time an individual tests positive, they have often been contagious for 48 hours prior to the test[]" and "[t]he costs of testing a large volume of unvaccinated employees were . . . significant[,]" *id.*

¶ 34; that "[f]or anyone involved in direct patient care or contact, physical distancing is simply not practicable, if not impossible[,]" *id.*; and, that, unlike other preventive measures, "vaccination not only protects against acquiring and transmitting the virus, it also . . . reduces the likelihood that an infected individual is contagious or will develop serious illness or death if they do contract the virus[,]" *id.* ¶ 35.

Judge Clarke noted that, in response to the 2021 COVID-19 surge, OHA issued a temporary rule, *former* OAR 333-019-1010, eff. Aug 5. 2021 to Aug. 24, 2021, that required healthcare workers to either be fully vaccinated or submit to weekly testing, and that 20 days later, OHA replaced that rule with an updated version, *former* OAR 333-019-1010, eff. Aug. 25, 2021 to June 30, 2023, that "remove[d] the testing option and require[d] all healthcare workers to be fully vaccinated or have a medical or religious exception in place by October 18, 2021." F&R at 7. Judge Clarke concluded that "OHA's decision . . . to add an additional vaccination requirement for healthcare workers, on top of existing masking and other requirements, strongly indicates that those existing measures alone were no longer sufficient to protect healthcare workers and patients." *Id.* at 20. Defendants' accommodations policy not only aligned with the current medical science, but it also complied with the law.

As to Plaintiffs, during the relevant period, Gemmrig worked as a Certified Nursing Assistant 2 ("CNA") "in the Pediatrics Unit and on the COVID-19 floor[]" "at Asante Three Rivers Medical Center (ATRMC) in Grants Pass, Oregon." Payton Decl. ¶ 27(a). In her role as CNA, she provided direct patient care (involving close physical contact) under RN supervision, *id.* Her job description included:

> promot[ing] patient safety and comfort by providing for activities of daily living, assisting with feeding patients . . . , ambulating, turning, and positioning patients, providing fresh water, nourishment between meals, providing patients' personal hygiene by giving perineal care, baths, helping with showers, oral care, assisting with travel to and from the bathroom or bedside commode, bedpans, urinals, and briefs every shift and as needed throughout the shift.

*Id.* Payton Decl., Ex. 7-A, Gemmrig Job Description, ECF No. 35 at 113. Gemmrig admitted that she could not perform 100% of her job duties remotely. Riggs Decl. ¶¶ 7, 8; Ex. 5, First RFA #5, ECF No. 36-1 at 17; Ex. 6, Second RFA #32, ECF No. 36-1 at 26 (untimely but deemed admitted under Fed. R. Civ. P. 36(a)(3)).

During that same period, Folin worked "as an RN at Asante Rogue Regional Medical Center . . . in Medford, Oregon, in the Short Stay Unit. Payton Decl. ¶ 25(a). In her role as RN, she "provid[ed] bedside nursing care directly to patients while they were hospitalized, including assessing patients, taking vitals, coordinating the plan of care, [and] administering medications[]." *Id.*; *see also* Payton Decl., Ex. 5-B Folin Job Description, ECF No. 35 at 94. Folin admitted that she could not perform 100% of her job duties remotely in an unsigned response to Defendants' RFA. Riggs Decl. ¶¶ 9–10, Ex. 7, RFA # 2, # 3, ECF No. 36-1 at 33 (unsigned).

Plaintiffs have not introduced evidence to rebut Defendants' evidence and cannot support their assertion that material fact issues exist.

B. *Undue Hardship Standards*

Plaintiffs assert that Defendants did not meet the Title VII or the ADA undue hardship standards. Pl. Obj. at 16.

1.     *Title VII Religious Accommodation Claim*

Plaintiff Folin asserts a religious accommodation claim against Defendants. Compl. ¶ 22, 23, ECF No. 1 (No. 1:23-cv-1389).  She applied for and was granted a religious exception.  *Id.* ¶ 13.  She was then placed on unpaid administrative leave. *Id.*  Defendants argue that "any accommodation other than leave would have been an undue hardship."  Def. Mot. at 16.

Title VII and its Oregon analogue provide a two-step analysis for failure to accommodate claims.  Once a plaintiff has made a *prima facie* case, the burden shifts to the defendant to show that it "initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship."  *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1224 (9th Cir. 2023) (internal citation and quotation marks omitted).  Here, the parties stipulated to Folin's *prima facie* case.  Accordingly, Defendants have the burden to show that it was not able to reasonably accommodate Folin without undue hardship.

Relying on *Groff v. DeJoy*, 600 U.S. 447, 470 (2023), Folin objects that Defendants failed to show that any other "accommodation would result in substantial increased costs in relation to the conduct of its particular business."  Pl. Obj. at 17–18.  Folin seeks to confine *Groff's* "costs" to direct monetary costs.  But she misreads *Groff*.  *Groff* directed courts to "resolve whether a hardship would be substantial in the context of an employer's business in [a] common-sense manner" and to "take[] into account all relevant factors . . . including the particular accommodations at issue

and their practical impact in light of the nature, size[,] and operating cost of [an] employer." *Groff*, 600 U.S. at 470–71.

Specific to the COVID-19 context, pre-*Groff* EEOC guidance provides that accommodation "[c]osts to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business including, in this instance, the risk of the spread of COVID-19 to other employees or to the public[.]"  F&R at 19 (citing EEOC Guidance).[7]  *Groff* did not displace EEOC guidance. *See Groff*, 600 U.S. at 471 ("[A] good deal of the EEOC's guidance [as to undue hardship] is sensible and will . . . be unaffected by our clarifying decision[.]").  As Judge Clarke explained, "courts in this District have determined that the EEOC provides sensible and relevant guidance consistent with *Groff*." F&R at 19. *See, e.g.*, *Lavelle-Hayden*, 744 F. Supp. 3d. 1135, 1151 (D. Or. 2024) ("Consistent with the pre- and post-*Groff* authority, this Court holds that it is appropriate to consider not only calculable economic costs but also non-economic costs, like the cost to an employer's mission and potential safety risks, in analyzing undue hardship.").

Accordingly, to evaluate undue hardship under Title VII, courts in this district consider: (1) the information available at the time the defendant made its accommodation decision; (2) economic and non-economic costs of the accommodation; and (3) the cumulative or aggregate effects of an accommodation requested by

---

[7] WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS, § L.3 (updated Mar. 1, 2022), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last visited Aug. 24, 2025) ("EEOC Guidance").

multiple, similarly situated employees. *Lavelle-Hayden*, 744 F. Supp. 3d. at 1151–52. Judge Clarke set out extensive findings as to each factor, some of which this Court also set out above. *See* F&R at 20–22.

As to the third factor, Judge Clarke noted that from "August 2021 through September 2022, Asante received a combined total of 1,009 religious and medical accommodation requests, of which it ultimately approved 807 (approximately 13% of its workforce)." F&R at 22 (citing Payton Decl. ¶ 9). Asante attested that the "unprecedented flood of requests . . . placed an incredible strain on an already exhausted staff to cover shifts and hire and train contract healthcare workers[,]" Payton Decl. ¶ 9, and that "the only safe and reasonable accommodation for the hundreds of unvaccinated employees with approved exceptions who could not work remotely was leave, effective October 18, 2021[,]" *id.* ¶ 11.

In sum, Defendants provided sufficient (and unrebutted) evidence that any accommodation other than leave for Folin would have constituted an undue hardship under Title VII.

### 2.    *ADA Disability Accommodation Claim*

Plaintiff Gemmrig asserts a disability accommodation claim against Defendants. Compl. ¶¶ 25, 26. ECF No. 1 (No. 1:22-cv-01814). Gemmrig applied for and was granted a medical exception to Defendants' vaccine mandate. *Id.* ¶ 10. Gemmrig was then placed on administrative leave. *Id.* ¶ 11. Defendants argue that "any accommodation other than leave would have been an undue hardship and/or direct threat." Def. Mot. at 31.

Like Title VII, the ADA and Oregon analogue provide a two-step analysis for failure to accommodate claims. *See Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 798–99 (9th Cir. 2017) (setting out the elements of a *prima facie* ADA claim). Once a plaintiff has made a *prima facie* case, the burden shifts to defendant who may invoke one of two affirmative defenses: (1) that the accommodation "would impose an undue hardship on the operation of the business;" or (2) that the plaintiff would "pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. §§ 12112(b)(5)(A), 12113(b). Here, the parties stipulated to Gemmrig's *prima facie* case. Accordingly, Defendants have the burden to show that they were unable to reasonably accommodate Gemmrig without undue hardship or that Gemmrig posed a direct threat to others in the workplace.

As to the ADA's undue hardship defense, Gemmrig objects that Defendants failed to make the "greater showing" of "significant difficulty and expense." Pl. Obj. at 20 (citing 29 CFR § 1630.15(d)) (emphasis in Pl. Obj.). The Court agrees that "[t]he ADA's "'undue hardship' standard is different from that [of] Title VII['s.]" EEOC ADA Enforcement Guidance.[8] But it is unclear that the ADA requires a "greater showing." Even assuming that it does, Gemmrig misreads the authorities.

First, the ADA does not require a showing of "significant difficulty *and* expense;" it requires a showing of "significant difficulty *or* expense." *See* 42 U.S.C. §

---

[8] EEOC, No. 915.002, Enforcement Guidance: Reasonable Accommodation & Undue Hardship Under the Americans with Disabilities Act No. (2002). Available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#undue (last visited Aug. 24, 2025) ("EEOC ADA Enforcement Guidance").

12111 (10) ("[U]ndue hardship" is defined as "an action requiring significant difficulty or expense, when considered in light of . . . the nature and cost of the accommodation needed; the overall financial resources of the facility . . . ; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation [on the facility]; . . . the [covered identity's] type of operation . . . , including the composition, structure, and functions of the workforce[.]") (Oregon analogue identical).

Second, EEOC guidance provides: "Undue hardship refers not only to financial difficulty, but to reasonable accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business. An employer must assess on a case-by-case basis whether a particular reasonable accommodation would cause undue hardship."  EEOC ADA Enforcement Guidance (citing 42 U.S.C. § 12111(10); 29 CFR § 1630.2(p); 29 CFR pt. 1630 app. § 1630.2(p)).

The Court agrees with Judge Clarke that, even assuming that the ADA imposes a higher undue hardship standard than Title VII, the same factors that satisfy the Title VII undue hardship standard also satisfy the ADA's.  Allowing Gemmrig to work unvaccinated, even with other preventive measures, would have substantially disrupted the workplace because it would have increased the risk of COVID-19 transmission and attendant morbidity and mortality among patients and co-workers, generated fear that Asante's facilities were not safe, deterred patients from entering the facilities, increased employee retention challenges, and deterred

potential employees from applying. The impacts (including the risks) would have been multiplied by hundreds, given the other similarly situated unvaccinated employees who would expect similar accommodation.

Defendants also invoked a direct threat affirmative defense to Gemmrig's ADA failure-to-accommodate claim. A direct threat under the ADA is "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1028 (9th Cir. 2003) (citing 29 CFR § 1630.2(r)). A direct threat determination "shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.* In weighing the risks and their magnitude, "the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority." *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998). Here, that also includes OHA. In reviewing those authorities, courts consider: "(1) the "duration of the risk;" (2) the "nature and severity of the potential harm;" (3) the "likelihood that the potential harm will occur;" and (4) the "imminence of the potential harm." *Id.*

Given the then-current CDC, NIH, and OHA medical and scientific data about COVID-19 including the delta strain, in this record, the Court determines that the duration of the risk was unknown, the severity of the potential harm was death, the likelihood that harm would occur at harm would occur to medically fragile and other vulnerable patients having repeated close physical contact with an unvaccinated

CNA, like Gemmrig, was high, and the imminence of potential harm was great as shown by the transmissibility, morbidity and mortality data and the surge of sick patients coming into Defendants' facilities. *See* Ghosh Decl. ¶ 13 (describing Asante's "full-blown healthcare crisis" caused by the surge in COVID cases caused by the Delta variant of COVID, which required Asante to convert any extra space into inpatient areas, double up single rooms, cancel nearly all non-emergency procedures, create long treatment delays for people suffering other serious conditions, and caused the Governor to activate the "National Guard to assist Asante with everything from janitorial work to administering COVID-19 tests.").

In sum, Defendants provided sufficient evidence that any accommodation other than leave for Gemmrig would have constituted an undue hardship or a direct threat under the ADA.

### 3. *Inquiry Standards*

Plaintiffs argue that Defendants did not meet the undue hardship standards or the direct threat standard because they "failed to do any individualized assessment of what, if any, reasonable accommodations they could implement regarding these Plaintiffs." Pl. Obj. at 20. Plaintiffs assert that Defendants were required to "carefully review the Plaintiffs' job responsibilities and risk factors and consider all of the available options, such as transfer to a lower risk position such as a remote role, or implementing additional masking and testing measures as many other hospitals did." Pl. Obj. at 22.

First, that is exactly what Defendants did.  Second, it is irrelevant what other hospitals did.  The fact-specific inquiry requires only that an employer engage the facts before it, as explained above.  Third, Plaintiffs provide no argument as to why Defendants' process does not apply to them.

The record is replete with the details of Defendants' process.  *See* Payton Decl. ¶ 8 (setting out steps taken to review individual religious and medical exception requests, which numbered in the hundreds); *id.* ¶ 9 (determining, based on the employee job descriptions, which of those employees were able to work remotely); *id.* ¶ 10 (using a "robust evaluation process" to determine potential accommodations for employees that could not work remotely)  *id.* ¶ 11 (deciding that, given then-current medical and scientific data, that all onsite employees would have to be vaccinated and that "the only safe and reasonable accommodation . . . for employees who could not work remotely was leave[.]"); *see also* Ghosh Decl. ¶¶ 30 (describing the plan by the Incident Command Committee to comply with the OHA rule, provide an exception process "with proper documentation and review [while] protect[ing] others from contracting or spreading COVID 19"); *id.* ¶¶ 31–37 (describing the decision-making process, and the data on which it was based, that resulted in the determination that distancing, masking, and testing were not safe options for any unvaccinated employee); *id.* ¶¶ 43–44 (describing the process used to assess the risks and possible accommodations for employees whose job duties required close patient contact, including CNAs and nurses, like Gemmig and Folin).

Plaintiffs do not explain why this process does not apply to them.  As Judge Clarke noted, "an employer is not required to restructure an employee's duties or pass them off to another worker if doing so would be an undue hardship."  F&R at 53.  *See*, *e.g.*, *Lake v. Healthalliance Hosp. Broadway Campus*, 738 F. Supp. 3d 208, 220–21 (N.D.N.Y. 2024) (holding that operational and personnel impacts from restructuring positions to avoid contact with others would create an undue hardship).

In sum, Defendants prevail on their Title VII undue hardship affirmative defense as to Folin and on its ADA undue hardship and direct threat affirmative defenses as to Gemmrig.

## CONCLUSION

For the reasons explained above, the F&R, ECF No. 53, is ADOPTED in full. Defendants' Motion for Summary Judgment, ECF No. 33, is GRANTED, and these cases are DISMISSED with prejudice.  Final judgment shall be entered accordingly.

It is so ORDERED and DATED this  5th  day of September 2025.


 /s/Ann Aiken
ANN AIKEN
United States District Judge

Page 24 – ORDER